Good morning, your honors. Daniel Selmy for the Appellate South Coast District. I'm going to try to reserve four minutes to the best of my ability. Honors, the issue before the court is whether the eighth largest source of nitrogen oxide emissions in the basin, a pollutant which is a formant of smog, is immune from regulation under both state and federal law. That's exactly what the district court held, and we would submit it's wrong. Under state law, the legislature did not carve out an exemption for the railroads from the vast array of regulatory authority that is otherwise imposed on sources. And under federal law, the court misconstrued the intersection between the Interstate Commerce Commission Termination Act and the Clean Air Act. The court's decision must be reversed. The first paragraph of the plaintiff's complaint says that it is attacking the rules on their face. If that is what the action is, then the judgment must be reversed and the rules must be upheld. If the plaintiffs are bringing it as applied challenge, then we would submit the trial court compiled a massive record of what the rules of facts were, but it never decided factually what they were. It truncated its fact-finding ability, and the matter would have to be reversed for the trial court to complete that task. Let me turn briefly to the state law issue, which the trial court found was determinative. The legislature could have quite easily said that the district couldn't regulate railroads. It takes five words. No district shall regulate locomotives. The legislatures don't do that, unfortunately. They certainly, this legislature was certainly much more direct in other statutes where it said it was curtailing authority. But if you add up, what is it, 40702 and the 39002, you led inexorably to the conclusion that you can't regulate railroad locomotives. It leads exactly to the opposite conclusion, Your Honor. 39002 and 4151, those two statutes preserve state authority, local authority, even when the state air resource is compulsory. Except as otherwise provided. Except as specifically provided, Your Honor. And that leads you back to fourth, what is it, I can't remember the numbers, 40702. 40702. And 40702 doesn't specifically prohibit districts from regulating. If it did, it wouldn't have mentioned the three specific terms that it did in the statute, the specific terms being the type of construction, the equipment and the design and the method. But what they're saying in those terms is this. You have to give a source, the railroads here, the ability, the flexibility to decide how they want to do it. You can't tell them the method to use. But that doesn't say you can't tell them that they can't produce. We would submit that that language was carefully chosen. And what it says is you can't tell them the method. It doesn't say you can't tell them a method. So let me see if I understand. The crux of your argument is that the regulation, although it's long and complicated, really says you can, we prefer that you stop idling, but if you don't want to do that, tell us what you will do that has an equally beneficial environmental effect. And if we agree that it does, you can do that instead. Absolutely. So that has to be, in a sense, that has to be your argument, because it's the reading of the rule that does not require any particular method. And it's not a post hoc interpretation. The rule actually says that. Right. That was my question. That's your interpretation of the rule. Well, that's what the rule said. Right. No, I understand. I understand. And it's there for a reason. That provision is there for a reason, because we understand what 407 of 2 says, and we understand that the legislature is concerned that for a lot of reasons, There are lots of reasons that you don't tell a source specifically how to do it. There may be other cheaper ways to do it. You may be, by giving a source only one method to regulate, you may well be telling it to only use one kind of pollution control equipment and create a monopoly. There's all sorts of reasons why you'd get flexibility. Again, I would submit there are much more direct ways to carve out an exception to regulatory authority, and this is not a direct one. This is one that says there's three types of things that you can't do, and we haven't done those three things yet. If I could turn to the direct regulation test. I'm sorry, one other point on that. It's certainly about two things. One is there are lots of instances under state regulatory law where both CARB and the local districts regulate. All toxic air contaminants, there's concurrent regulation for. Consumer products, there's concurrent regulation for. A whole series of non-road entries, there's concurrent regulation. This is not a situation that's uncommon at all. And, in fact, the CARB staff report that we cited in the court indicates the CARB staff itself recognizes that the district still has authority in this area. So we would submit when you do tie all these together, it's very unlikely that the legislature, given the pollution problem in the south coast air basin, we regulate sources as small as charbroilers, platers. There's all dry cleaners that are regulated. It's very unlikely that unless it was going to be much more specific, the legislature would have carved out the eighth largest source of NOx in the basin and said you can't touch it. We would submit when you put all that together, it's clear the district retained authority. If I could turn to the direct regulation issue, the district court found that under federal law, the district's rules were invalid because they directly regulate locomotives. There is absolutely no authority for that test. You can't cite a surface transportation court decision, which states so states. You can't cite a judicial decision, which so states. The chief body of case law here under ICTA, as we call it, is the surface transportation court decision. And they have said repeatedly that the Clean Air Act and other federal environmental law statutes and ICTA have to be harmonized. ICTA does not trump the Clean Air Act. And the direct regulation test automatically does that. Any regulation which touches the railroads, according to the district court, is automatically preempted by ICTA. The STD's decisions, the surface transportation court's decisions, do find certain classes of regulations automatically invalid. And those are the ones which prohibit, which can prohibit railroads from operating, you know, local zoning decisions, for example, or those that require a permit, because permits can be denied. Those are off-limits. The district's rules don't fall into that category at all. As a matter of fact, they were carefully crafted to limit the impact. I mean, the staff visited over 15 rail yards and dispatch centers. There were four public workshops. There were two or four working group meetings, two public workshops. If you look at, I think it's transitive. Let me just ask you a practical question, because I'm not real familiar with the structure. But it struck me that your principal avenue is to go and get CARB to buy into your program. As I understand it, the memorandum of understanding between the railroads and CARB that you opposed, and so you didn't succeed. So why can't you take your rules to CARB and get CARB to sign on, in which case probably you're home free? Well, two answers. First of all, we wouldn't be home free under the district court's decision because CARB would be preempted as well. But aside from that — Yeah, but you're going to have an opinion out of this Court, which is going to say what the rule is, presumably. But aside from that, Your Honor, as we talked about earlier, there are lots of instances in which the South Coast District, being in the most polluted air basin in the country, needs to impose regulations that simply go further than regulations that are statewide. The MOUs are statewide regulations. Look, you're starting from the premise that there is broad preemption under ICA that the Clean Air Act permits but doesn't require the kind of regulation that the rules reflect. If you have to get your rules embedded in the state implementation plan, have that plan approved by EPA and therefore become Federal law? And we have those — submitted those rules or have indicated to EPA that we will submit those rules to them if they're upheld by the Court. That's in the latest Air Quality Management Plan, and we will do that. If they are put into the SIP, the consequence of that, then, would be that they are federally enforceable. But just because they are in the SIP and federally enforceable now doesn't mean that these rules were not adopted under the Clean Air Act. The Clean Air Act's mandate, the mandate, its requirement is that we attain the national ambient air quality standards. So the requirement is for a state implementation plan? Correct. And in the South Coast Air Basin, it's just — Which you don't do. I mean, that's not your responsibility. Well, it is in the South Coast Air Basin. Under state law, it's the district that compiles the part of the SIP that applies to the South Coast Air Basin. And that's why we put it in and said we're going to submit it to EPA when it comes. Your Honor, there's certainly no law that says that until a matter is in the SIP that the air pollution regulation or the air pollution emissions that are controlled can't be counted as emission controls toward meeting the national ambient air quality standards. No authority for that at all. I mean, ultimately, they have to be accounted for in the SIP, and they will be. But, you know, litigation intervened here. And so we never got that far. I mean, that's a whole — I mean, you may like or dislike the concept of preemption. But, I mean, the heart of it is that you don't have patchwork regulation for certain things. I mean, railroads are very different from dry cleaners and certainly very different from backdoor barbecues. And there's hardly anything, as we said, in the City of Auburn. I mean, there's hardly anything in the — you can think of that has — that has a broader preemption base than the railroad industry. There's no question that railroads are not the same as other sources. But it's a — it's a leap from that conclusion that there's no authority at all over them. And we would submit, as the Surface Transportation Court has recognized, that it does not preempt regulations pursuant to the Clean Air Act. Under the Clean Air Act, it's very clear, or at least it's EPA's position, that locomotive use regulation is allowed under Section 209. The EPA held that in the Engine Manufacturers Association versus EPA in the D.C. Circuit. And EPA has never reneged on that interpretation. It still follows that. And we — we come under that. Now, Your Honor, you're absolutely right. You know, railroads are different. And ICTA is what makes them different. It says you can't have undue restrictions or unreasonable burdens. That's a factual question. That's a question about what the effect of these rules are. And the trial court never got to that. It found that we — found we were preempted as a matter of law. I believe, if it's okay, I'd like to reserve the remaining time. MS. JANKINS. May it please the Court. My name is Robert Jankins. I'm counsel for the Association of American Railroads and BNSF Railway Company. And with me at counsel table is Kevin Fong. He's counsel for Union Pacific Railroad Company. I'd like to start out by addressing, Judge Reimer, the point that you were making toward the end, which is — isn't what they ought to do here is to get CARB and EPA to approve these rules. And if they do, that becomes part of the SIP and it becomes federally enforceable. And then you do have a harmonization question. And the answer to that is yes. That's exactly what the statute provides for. I would refer to Judge Graber's decision in Latino Issues Forum, which came out in March, where you were dealing with the Waukeen Valley — San Joaquin Valley District. But the district court sort of cut things off at the pass by saying that state law prohibited this rule from existing. That's correct, Your Honor. And I have some difficulty with that. And I'd like to ask you some questions about it. Okay. In your view, if a regulation in this area said you must cut your emissions by one-half in the next five years, would that be prohibited as a regulation on locomotives? Yes, it would be. Because what you're essentially doing is you're saying we're going to establish regulations. Let's take 3501, for example, which said there were three things that we want you to do. You can either adopt — you can either install idling control devices or you can put in alternative technology, which we know is not feasible today for line-haul locomotives because it relies on batteries and natural gas. So you read this prohibition on specific methods as also prohibiting general standards of behavior? If you then say this is the way that you will do it, one of these three methods — So if — well, but there's a catch-all that says, come tell us, if you have a way to reduce pollutants by this much, just let us know. There's a catch-all in your hypothetical. There's a catch-all in the rule, I think. There's a catch-all in 3501. It says you adopt alternative — an alternative technology that reduces emissions by 90 percent, which is impossible. You install idling control devices, which they're not authorized to require us to do. Or you incur substantial costs to do record-keeping of how many times you have an idling event. You get it certified by a senior officer of the company who has to certify that everything that you report is correct. And if you don't do it exactly right, you're subject to substantial penalties. It's an effort to coerce us into installing idling control devices. I have difficulty seeing how a strong incentive to do something is the same as what is prohibited by the state law. For example, if you're looking at water usage and you say to people, stop watering your lawns, or tell us how you're going to save the water equivalent. So somebody may say, well, I'll stop running the dishwasher and I'll stop giving my dogs baths, and that saves just as much. You haven't actually required them to stop watering their lawns. You've required them to reduce their water usage. And it seems to me that this is a regulation like that that says we want you to stop doing this or do something equivalent that has the same beneficial effect on the environment. Well, consider the backdrop here. The backdrop is the 2005 MOU, which had carefully worked out provisions, voluntary provisions between the railroads and the state with respect to each of the things that the district's regulations attempted to cover in more detail because they didn't think that CARB's efforts went far enough. So they were clearly trying to get additional emissions reductions out of the railroads. They said as much. Well, now you're talking about something different than whether the statutory prohibition is at work. You're talking about the structure of the state plan. But I want to also, you mentioned the record-keeping rule, and I must say I don't understand your argument that that is a method of governing the way locomotives work. It's a method of governing the way record-keeping works. Your Honor, we think that the judge pretty clearly found that it was simply harassment. Why is that the case? I mean, every food manufacturer probably thinks the FDA labeling requirements are harassment, but isn't the public entitled to know and conform its behavior? For example, if I'm going to ship something, maybe I want to pick the railroad that's the least polluting. I mean, there are legitimate reasons why that information might be made publicly available other than harassment. There could be legitimate reasons, and as I said, CARB and the railroads had carefully worked out what they thought would work with respect to the railroads. Okay, well, we're talking about two different things now because I'm still talking about your argument that state law, because of this locomotive provision, says, oh, we can't even keep records about locomotives. That seemed to be part of your argument. It is part of the argument because in context, and I would encourage you to read the testimony that we reference. I'm still talking about the facial challenge. I am still talking about the facial challenge, too. Okay, so the testimony is relevant how? The testimony is relevant because the court found three times in its decision that this was direct regulation that impacted the railroad. Well, I know it said that, but yes, it affects them because they have to keep records. If it didn't affect them, you wouldn't have standing to be here. That's not really the question. I just don't understand why the state law saying you can't tell us how to equip a locomotive is affected at all by something that says keep records and tell us how much you pollute. The record keeping is not easy. You're asking the crews, the dispatchers to keep close account of every locomotive that has over 30 minutes of idling on any day, do weekly reports and yearly reports. It's a lot of effort. And the same thing with respect to 3503. The railroads estimate it would cost them billions of dollars to comply with that requirement. And if it spread across other jurisdictions, it would be billions of dollars. And the judge, as he said, listened to three days' worth of testimony about this. So it is not an inconsequential thing at all. Let me ask you a question. Does it make any difference whether any of the three rules are authorized under California state law if ICTA. Well, the ICC Termination Act. Yeah, I can't say that either. Preempts. And the Clean Air Act is not in conflict because there is no state implementation plan. Incorporating those rules has been approved by EPA. No, it does not matter. And that was what I was going to say. So why are we all twisted up and spending all this angst over whether the state rules, the district rules, comport with the state or not? The reason we're all twisted up is that that was what, that is as far as the district court got, but he could readily have alternatively decided, and you could clearly alternatively decide that it doesn't matter. It's still, even if they had authority under state law to adopt these rules, it's still state law unless and until they get it approved by CARB after notice and comment rulemaking, and then approved by EPA after notice and comment rulemaking. Until that happens, it's not Federal law. And there's no harmonization required. There's no need for a remand. Why isn't that just the beginning and end of this case in kind of simple terms? I think it could very well be, Your Honor, the beginning and end of this case. And I'm going to ask a question.   I'm going to ask a question. Explain to me why you think ICTA preempts the rules in question. It preempts the rules in question because, contrary to what Mr. Selmy said, there is plenty of law for the proposition that if you directly regulate a railroad's train operations or any of their other core operations, that it is preempted per se. What's your best case that would suggest that this specific kind of regulation is preempted? There are three, I would point to. In City of Auburn, City of Auburn cited to CSX versus Georgia Public Service Commission for the proposition that it is difficult to conceive of a broader preemption provision than this. That was a case dealing with what are called railroad agencies. They're railroad sales offices. And the decision there was that a Georgia law which said that you had to get approval from the state of Georgia in order to close a railroad sales office was preempted on its face by the ICTA. There's another case exactly like it, the Anderson case, both of which were cited by the Ninth Circuit in the City of Auburn case. And I think it's particularly relevant here, and I'll get to my other two cases in a second, but I think it's particularly relevant. Mr. Selmy says we have to do a balancing here, like a Commerce Clause undue burden balancing. And below they actually cited a Commerce Clause case involving BNSF, in which BNSF went to court over closing of railroad sales offices. And in 1985, the Ninth Circuit said that that was not an undue burden. They balanced the interest of the state of Montana against the interest of the railroad and said that it wasn't a violation of the Commerce Clause. As soon as the ICTA was passed, railroads went back, and that same Montana statute was declared preempted. And we cover this in footnote 12 of our brief. So there's no balancing test to be done after the ICTA. There are two other cases that the judge cited. One is the Freiburg case involving crossings where the state was prosecuted under state criminal law and also had a private nuisance action brought against it. And the state, this is in the Fifth Circuit, and the court didn't do any examination of whether or not this was an important statute for the state. It didn't look at how much it would interfere with railroad operations. It simply said it's preempted. And the third case is also cited by the judge, the Rushing case, which involved operations in a rail yard. And there was a nuisance action brought. And with respect to the operations in the rail yard, the district court held that it was preempted. It didn't matter how strongly the locality felt about these operations. It was direct regulation and had economic impacts on the railroad. And that was it. And there was a berm. And I think this is relevant to outside the rail yard that the court thought was said was incidental or peripheral. And they said that that could that that part of it could go forward, but not with respect to the rail yard. So those would be my primary cases on that. I think it's important, too, to recognize that the judge made an express finding on the other question Judge Reimer raised, which is this patchwork regulation. He looked at the evidence that had been presented by the district that this wouldn't have that much of an impact if it were applied if the other 35, it wouldn't be 35 because we don't operate in all 35 of them, but in every district. I want to your time is about to run out. But you started by saying, gee, if they just get the state to put this in the state plan, and then it's fine because then you then you have a harmony harmonizing. I can't say harmonizing. Between the Clean Air Act and ICTA, how do they get from here to there if your position is that they can't even get started? They can propose a regulation, Your Honor. They can implement it. They can propose it. CARB can adopt it. EPA can approve it. And if it's approved, that doesn't mean we still won't challenge it because we still have this harmonization issue. But if it's approved, at least they have the harmonization argument. What they can't do is adopt this on their own and then say because it was adopted under our authority to regulate air pollution, which, as they point out, all of their activities are. So everything they say is under the Clean Air Act. Because we did that, ICTA doesn't apply. Or we have this harmonization question. We said we don't have the harmonization question unless and until this is approved by EPA. If it's approved by EPA, then you have a harmonization question. And we'll take up then whether or not the ICTA still preempts it. Any other questions? Okay. Thank you. Thank you. Mr. Jenkins. Mr. Selmy. Thank you, Your Honor. Four points. I'd like to adjust Judge Lambert's question about what would happen if there wasn't a Clean Air Act? If the Clean Air Act wasn't at issue, would ICTA simply preempt? And the answer is no. At that point, the surface transportation board's jurisprudence is clear. The test is whether there is undue restriction or reasonable burden. And that's a factual question. We would then fall back on the STB's test. There's no per se preemption here. The only per se preemption under that board's jurisprudence is when you have a regulation that would prohibit the railroads from operating. And this regulation was drafted not to nearly do that. As far as the SIP goes, two points about it. The railroads have produced and can produce no law which says that a district regulation is not effective until it is approved in the SIP and approved by EPA. In fact, in lots of instances, we adopt regulations and submit them for EPA, and then EPA approval comes later because we're concerned if they're not approved, you're going to have instances of two regulations being in effect at the same time. It's just not uncommon. And there's no law that says it's not a Clean Air Act regulation. And our findings, well, why else would we adopt the regulation if not to meet the national ambient air quality standards? That's the district's function to do that. As far as the information goes, there is a specific, and Your Honor asked questions about that, and Judge Graber asked questions about the information. There's a specific State statute. There's no question about the State's authority there. Health and Safety Code 41511 allows the district to adopt regulations requiring sources to characterize their Indian employees and what they're emitting. So there's not a state law issue there. The information is critical here, though, because diesel emissions are toxic air contaminants. And the one study that was done in the Bay Area showed alarming rates of carcinogenic impacts surrounding a large railroad up there, up to 1,000 in a million. The district regulates at 10 in a million. So there are important impacts. That information is important that those individuals who live nearby find out. Finally, if we're talking about patchwork, I can talk about 10 minutes on it, but it's a factual question, whether there's a fact or whether there actually is a patchwork here. And that, again, like all the other factual questions, the district judge simply never made findings on. He truncated the analysis. And we submit it should be remanded for that complete analysis. Unless the Court has any questions, I'll see you later. Thank you. Thank you. The matter just argued will be submitted, and the Court will stand adjourned. All rise. Thank you. Thank you. Thank you. Thank you.
judges: Rymer, Graber, Aldrich